2025 IL App (1st) 250645-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
December 22, 2025

No. 1-25-0645

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL EGGUM, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff/Counterdefendant-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 L 2849 |
| | ) | |
| RYAN KOWALIS, | ) | The Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant/Counterplaintiff-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court's order granting a new trial based on inconsistent verdicts is affirmed.

¶ 2    We granted a petition for leave to appeal in this case to review whether the trial court correctly ordered a new trial based upon its finding that the jury's verdicts on the parties' respective claims against each another were legally inconsistent.

¶ 3    The parties to this case are Michael Eggum, the plaintiff and counterdefendant, and Ryan Kowalis, the defendant and counterplaintiff. Beginning on March 13, 2018, they were co-owners

of a restaurant venture, the corporate name of which was Kerouacs Café, Inc. (Kerouacs).[1] Steven Tsonis, a former defendant who settled prior to trial, was also a co-owner.

¶ 4     The case went to verdict on Eggum's claims against Kowalis for fraud and breach of fiduciary duty and on Kowalis's counterclaims against Eggum for defamation *per se* and false light invasion of privacy. A jury returned a verdict in favor of Eggum on both of his claims against Kowalis and in favor of Kowalis on both of his counterclaims against Eggum. The trial court thereafter ruled that the verdict it returned in favor of Eggum on his fraud claim was legally inconsistent with the verdict it returned in favor of Kowalis on the defamation and false light counterclaims. In summary, Eggum's fraud claim was that Kowalis had made various false statements to fraudulently induce him to invest his life savings into Kerouacs's bank account, which Kowalis subsequently took for himself. By contrast, Kowalis's counterclaim was that Eggum had defamed him and placed him in a false light by various actions that Eggum took to publicize his allegations that Kowalis had defrauded him out of his investment into Kerouacs. The trial court determined that it was legally inconsistent for the jury to have found both of these matters to have been proven true, and it ordered a new trial on this basis. We agree that the verdicts are legally inconsistent and therefore affirm the trial court's order granting a new trial.

¶ 5                                              I. BACKGROUND

¶ 6     A detailed recitation of the trial evidence heard by the jury over the course of this six-day trial is not necessary to resolve the legal issue presented in this appeal. The court has reviewed the trial transcript and recognizes that there were many highly contested issues of fact in this case. We set forth from our review of the record the following summary of our understanding of the claims

---

[1] Kerouacs Café, Inc., was named as a defendant in this case. However, it is apparently a dissolved corporation, and no appearance was ever filed on its behalf.

that were presented to the jury that are now argued to be irreconcilable.

¶ 7      Around the timeframe of late 2017 and early 2018, Kowalis and his friend Tsonis were looking to open a restaurant together. Tsonis was an experienced professional in the restaurant industry, and Kowalis's background was in working at car dealerships owned by father and uncle in the south suburbs. They ultimately settled on buying Kerouacs, an existing restaurant in Chicago which they planned to reopen in the summer of 2018 as a taco restaurant to be called "The Gringo." The owner of Kerouacs from whom they were purchasing the company was Matthew Lappe.

¶ 8      Around this same timeframe, Eggum was looking for a venture in which to invest money that he had saved from an 8-year overseas military career that had ended following an injury. A mutual acquaintance named Jon Ruiz connected Eggum with Kowalis and Tsonis, and the three men began discussions that culminated in Eggum initially buying a 15% stake in Kerouacs directly from Kowalis and Tsonis for $100,000. This transaction was effectuated by the parties' execution of a "Stock Purchase Agreement and Shareholder Agreement" on March 13, 2018, at which time Eggum made a wire transfer of $100,000 into Kerouacs's corporate bank account.

¶ 9      At trial, Eggum's fraud claim centered primarily on allegedly false statements by Kowalis that led to Eggum's making this $100,000 wire transfer into Kerouacs's bank account on March 13, 2018. A second component of the fraud claim also involved allegations that Kowalis made additional false statements to further induce Eggum to make a second wire transfer of $65,000 into the company's bank account on August 27, 2018. These two investments were the bases of Eggum's attorney's request in closing argument for $165,000 in compensatory damages from Kowalis on his fraud claim.

¶ 10      We distinguish the above two transactions that formed the bases of Eggum's fraud claims from his related allegations seeking recovery from Kowalis under the theory of breach of fiduciary

duty. Under this latter legal theory (which is not at issue in this appeal), Eggum requested compensatory damages comprising (1) $100,000 for the value of stock in a different company that Eggum swapped to buy out the shares of Kerouacs owned by a co-investor named Janet Ruiz, proximately caused by Kowalis's misleading statements about the reason why Janet Ruiz had filed a lawsuit against Kerouacs; plus (2) $75,124 owed as monthly "incentive payments" to be paid to Eggum totaling 5% of the corporation's monthly gross revenues, which were unpaid to him because of Kowalis's double-pledging the same kind of payment to Janet Ruiz.

¶ 11    Focusing on Eggum's claim of fraud surrounding his wire transfer on March 13, 2018, of $100,000 to Kerouacs's corporate bank account, the allegedly false statement by Kowalis upon which Eggum's claim was primarily based was that he and Tsonis owned the entirety of Kerouacs by that date, with no other person having an interest in its stock or assets. This fact was represented as part of the parties' stock purchase and shareholder agreement. However, Eggum produced evidence at trial showing that as of March 13, 2018, Kowalis and Tsonis had paid Lappe only half ($37,500) of the total purchase price of $75,000 and that the remaining $37,500 was not due until 60 days after the restaurant opened to the public (*i.e.*, around August 2018). Until that second payment was paid, the purchase agreement between Kowalis/Tsonis and Lappe gave Lappe the right to a confession of judgment to take back the stock and equipment from Kowalis and Tsonis. Eggum was unaware when he made his initial investment that Kowalis and Tsonis were not the sole and exclusive owners of the company's stock and assets as of that date. The evidence at trial showed that the second payment was never made to Lappe until 2020, after The Gringo had ceased operations. Kowalis only paid this as part of a settlement to avoid a lawsuit by Lappe.

¶ 12    A second allegedly false statement surrounding Eggum's March 13, 2018, wire transfer of $100,000 was an oral representation by Kowalis on the same date that both he and Tsonis had

deposited investments of $100,000 apiece into the same corporate bank account into which Eggum was transferring his money. The evidence at trial indicated that no such deposits occurred.

¶ 13    A third allegedly false statement by Kowalis surrounding the March 13, 2018, wire transfer was a representation in the stock purchase and shareholder agreement that, beginning the third month after the restaurant opened, Eggum would be repaid a total of $100,000 through monthly "incentive payments" to him of 5% of the corporation's gross revenues. Eggum's allegation was that Kowalis made this statement without intending to perform this promise, and there was evidence that Eggum was not in fact paid these monthly incentive payments.[2]

¶ 14    A fourth allegedly false statement by Kowalis surrounding the March 13, 2018, wire transfer was his representation in the stock purchase and shareholder agreement that, with certain exceptions, "the Corporation shall not make any payment or transfer of money or property to the [*sic*] Tsonis or Kowalis, regardless of whether such payment or transfer is characterized as salary, wages, compensation, bonuses, or otherwise." The evidence at trial showed that on March 14, 2018, which was one day after Eggum wired his $100,000 investment to Kerouacs's corporate bank account, Tsonis and Kowalis respectively transferred $45,000 (for a total of $90,000) out of that account and into their personal bank accounts. Eggum testified that he was unaware that this money had been transferred out of the company's bank account and never gave his consent for this withdrawal. Kowalis's position was that he was allowed to make this transfer because Eggum was buying Kowalis's shares of stock directly from him, and the wire transfer of money into the company's bank account had been a matter of convenience to enable Eggum to make only one

---

[2] The court's understanding is that recovery for the actual failure to make these monthly incentive payments was sought under the count for breach of fiduciary duty, but Eggum was permitted at trial to argue that Kowalis's false representation on March 13, 2018, that the incentive payments would be made (when he had no intent to do so) was part of the fraud that led Eggum to make the $100,000 wire transfer.

wire transfer instead of two.

¶ 15    As referenced above, on August 27, 2018, Eggum made a second wire transfer of $65,000 into Kerouacs's corporate bank account for the purported purpose of financing an enclosed patio. Instead of being used for a patio, that $65,000 was transferred out of Kerouacs's corporate bank account the following day, and Eggum's claim was that Kowalis was responsible for this. In exchange for the money, Eggum received 100 additional shares of stock in Kerouacs out of the 425 shares owned by Tsonis, along with the right to an additional incentive payment of $5,000 bimonthly from September 1, 2018, through March 1, 2019. Part of Eggum's fraud claim was that Kowalis represented in the written agreement executed as part of this transaction, which Kowalis signed both personally and on behalf of the corporation, that Eggum would receive these additional bimonthly incentive payments without any intent to pay them.

¶ 16    The facts above, which formed the bases of Eggum's fraud claims, are to be distinguished from two related events that formed the bases of Eggum's counts for breach of fiduciary duty. Those events both involved Janet Ruiz, a fourth co-investor in Kerouacs during part of the relevant timeframe of this case. (She was also the mother of Jon Ruiz, who introduced the parties and worked at The Gringo for a time.)

¶ 17    The first event occurred on April 11, 2018, when Kowalis and Tsonis entered into a separate stock purchase and shareholder agreement with Janet Ruiz without informing Eggum that they had done this. Janet Ruiz thereby acquired 12% of Kerouacs from them in exchange for $100,000 that she wired into Kerouacs's corporate bank account the following day. A few weeks later, on April 23, 2018, both Kowalis and Tsonis transferred $40,000 ($80,000 total) out of Kerouacs's corporate bank account and into their personal bank accounts. Kowalis then made an additional transfer of $9,000 into his personal bank account on April 24, 2018. Eggum was not informed of this transfer

of money out of the corporate bank account, although this was not claimed as part of the damages in this case. Instead, the claim was that Kowalis's alleged double-pledging of the same monthly incentive payments to Janet Ruiz that he had pledged to Eggum was a proximate cause of the fact that Eggum did not receive these payments.

¶ 18    The second event arose when Janet Ruiz filed a lawsuit against Kerouacs, Kowalis, and Tsonis, based on their failure to pay her the monthly incentive payments to which she was entitled under her stock purchase and shareholder agreement (just as they were required to do under Eggum's stock purchase and shareholder agreement). The alleged breach of fiduciary duty occurred when  Kowalis, between December 2018 and the fall of 2019, allegedly misled Eggum about the true basis of Janet Ruiz's lawsuit. Eggum alleged that Kowalis made statements that led him to believe that Janet Ruiz was trying to create problems for the restaurant because her son Jon had been fired. Based upon Kowalis's allegedly misleading statements about the reasons for Janet Ruiz's lawsuit, Eggum agreed to a transaction with her whereby he swapped 200 shares that he owned of a different company (which he valued at $100,000) to Janet Ruiz to buy out all of her shares of stock in Kerouacs. The value of this stock-swap transaction was claimed as part of the compensatory damages on the breach of fiduciary duty claim.

¶ 19    The evidence at trial showed that, prior to March 20, 2020, Eggum had access only to a limited amount of Kerouacs's financial information. However, that day, Eggum's access within the company's bookkeeping software was changed such that he discovered many withdrawals from Kerouacs's bank accounts of which he was previously unaware. Most pertinently, that was when he first became aware that Kowalis and Tsonis had transferred the majority of his March 13, 2018, investment of $100,000 out of the corporate account and into their personal bank accounts the day after it occurred; that they had transferred the majority of Janet Ruiz's $100,000 investment

out of the corporate account within a few weeks of its deposit; and that his August 27, 2018, investment of $65,000 had been transferred out of the corporate account the day that it occurred.

¶ 20    The evidence showed that, after first learning of these financial discrepancies, Eggum did not confront Tsonis or Kowalis for at least five months. Instead, in April or May 2020, he took the information he had discovered to the Federal Bureau of Investigation (FBI), which opened an investigation into whether Tsonis or Kowalis had engaged in criminal conduct. The FBI ultimately closed its investigation in November 2021 without filing charges. In the meantime, however, Eggum undertook several actions to publicize his belief that Kowalis had defrauded him out of his investment in Kerouacs and to the fact that Kowalis was under criminal investigation by the FBI for this conduct. It is this conduct by Eggum that formed the bases of Kowalis's counterclaims for defamation *per se* and false light invasion of privacy.

¶ 21    In February 2021, Eggum hired a freelance journalist and public relations professional named Richard Dolan to help him publicize his story that Kowalis had defrauded him. In the course of developing a story that would draw the interest of media outlets, Eggum directed Dolan to contact various individuals and organizations associated with Kowalis's family's car dealerships to solicit comments from them for a news story about the allegations against Kowalis. There were various instances of this, but the chief example put into evidence at trial was that, on February 27, 2021, a message was sent from Dolan's e-mail address to one of those dealerships, Lexus of Merrillville. That message, which Eggum acknowledged that Dolan had sent at his direction, stated as follows:

> "I'm reaching [*sic*] in reference to a press release I've come into possession of detailing a lawsuit where your Director of Marketing (Ryan Kowalis) is named. Ryan Kowalis is alleged to have committed fraud and misrepresented himself in order to solicit for investment a service-disabled veteran's life savings of $265,000 which he earned over 10 deployments

to the Middle East.

My concern is that Mr. Kowalis is defrauding potential investors under the guise of being a director in the Toyota and Lexus family and maybe buying some legitimacy with the title. It seems a bit predatory and I'm trying to add some color to this allegation. There are already a few local Chicago journalists who are chasing this down as well.

I'm curious if your company policy addresses any of this type of action on behalf of employees. Thank you for any comment you can provide on this."

¶ 22 Eggum's complaint in the case at bar was filed on March 15, 2021. Two days after that, Eggum and his attorney gave an interview about the case to a television news reporter from Chicago's CBS affiliate. In that interview, Eggum's attorney stated that Kowalis and Tsonis had "made a bunch of false statements to [Eggum] in order to convince him to invest money." Eggum then stated, "When I put my money in, they hadn't even owned the restaurant." Eggum also stated, "I just sat there, figured all of the data points out, and then I brought all of that to the FBI."

¶ 23 That same day, Eggum made a post to Facebook with a link to an Internet article including the local CBS news broadcast. The headline of the article linked was, "Army Vet Sues Former Restaurant Business Partners, Claiming They Defrauded Him Out Of Hundreds Of Thousands In Failed West Town Venture." Eggum also wrote as part of the Facebook post, "In case you were wondering what kind of people Steve Tsonis and Ryan Kowalis are, read this article and watch the news story. Luckily, the law is on my side and they will be brought to justice."

¶ 24 On March 18, 2021, Dolan sent a press release to various other news outlets attaching a link to the local CBS news broadcast and including the following message:

"Please consider taking a look at how a Chicago-based restaurateur and local car dealership director of marketing allegedly defrauded a disabled military veteran out of his

life savings. The project—The Gringo restaurant in Chicago's West Town—eventually failed and investment money was spent on personal luxury purchases. An FBI investigation is ongoing, others were hurt and the trail of fraud is long and complex. The story was recently covered by CBS2 Chicago. Thank you for your consideration in furthering this story."

The press release also attributed to Eggum the following quote: "I wish I didn't have to bring it to this point, but I want to make sure these guys can't defraud anyone again like they did to me."

¶ 25     That same day, Dolan sent a copy of the same press release to a representative of the corporate communications department of Toyota Motor North America with the following message:

"I am following up with you based on the story I shared with you earlier this month. There have been two updates to the story. The story was aired on CBS2 Chicago and the lawsuit was officially filed naming Mr. Kowalis of the Kowalis Auto Group. An updated press release is attached. I acknowledge from our last email exchange that TMNA does not hire, fire or direct the day-to-day activities of the dealership's personnel, and it is not involved in matters concerning employees. However, the defendant named is more than an employee—his family holds the dealer licenses. Does TMNA have criteria by which they judge dealership owners? From your previous email, you mention that the allegations are not in line with TMNA's core values, which raises concern when a member of the family who directly owns and runs the dealership representing Toyota is involved in public cases like this."

Text messages in evidence between Eggum and Dolan indicated that Eggum had specifically directed Dolan to inquire about the dealership licenses issued to Kowalis's family and essentially to ask, "Is this who you want representing Lexus or Toyota?"

¶ 26     Finally, Kowalis introduced evidence that around this same timeframe, Eggum had created a

fundraising page on the website GoFundMe.com, captioned "Veteran Defrauded out of Life Savings." Among the statements by Eggum on that page were that, after finding out that Kowalis and Tsonis were transferring investment money into their personal bank accounts and using the corporate account for personal expenses, Eggum "brought the Federal Bureau of Investigation in to open a criminal investigation," which was at that point ongoing. Eggum also stated that Kowalis, "instead of doing the right thing, has hired two law firms to try and get out of paying Eggum back." His page described one of those law firms as "a prominent federal criminal defense firm" that advertised on its website that it serves clients " 'charged with the most serious federal crimes.' "

¶ 27    Eggum's testimony on adverse examination concerning the above statements culminated in the following exchange:

"Q. You wanted them to know that Mr. Kowalis had retained counsel, right?

A. Yeah.

Q. Specifically criminal defense counsel, right?

A. Yeah.

Q. In response to your criminal complaint, right?

A. I suppose.

Q. Because you were accusing him of a crime, right?

A. I believe he had defrauded me.

Q. That was my question. You accused him of a crime, right?

A. I believe so.

Q. You don't know?

A. Yeah. He stole my money.

Q. Right. You went to the F.B.I. and accused him of a crime, right?

A. Yes.

* * *

Q. And then you told everybody you had gone to the F.B.I. and filed a criminal complaint?

A. Yes.

Q. Because you wanted everyone to know that you thought Ryan committed a crime?

A. Yes."

¶ 28     The jury instruction given in this case on defamation *per se* informed the jury in pertinent part that Kowalis had the burden of proving that Eggum made an unprivileged publication of a false statement imputing that Kowalis (1) has committed a crime, or (2) is unable to perform or lacks integrity in performing his employment duties, or (3) lacks ability or otherwise prejudices him in his profession. However, in discussing this instruction during closing argument, Kowalis's attorney made argument only that Eggum had made a false statement imputing that Kowalis had committed a crime. He stated, "We have a plethora of evidence of him on CBS, in his Go Fund Me page, in his press releases, in the e-mails that he had sent to Toyota that he is alleging [Kowalis] defrauded him. That is a crime."

¶ 29     As to the counterclaim for false light, Kowalis's attorney argued in closing that placing someone in a false light meant "whether [Eggum's] publicized statements were false." He argued that it required proof of actual malice, which meant that "[Eggum] acted with knowledge that the statements were false or recklessly disregarded whether they were true or not." Counsel argued that actual malice was shown, among other things, by how Eggum (acting through his agent Dolan) ensured that his allegations were spread to Kowalis's family's car dealerships and to Toyota, even

though Kowalis's employer and family members had nothing to do with Kerouacs or with Eggum's claims.

¶ 30    At the conclusion of the trial, the jury returned a verdict in favor of Eggum and against Kowalis on the claims for both fraud and breach of fiduciary duty. The jury awarded Eggum compensatory damages of $99,000 on the count for fraud and $14,837 on the count for breach of fiduciary duty, and it awarded punitive damages of $283,000, for a total damages award of $396,837. Simultaneously, the jury returned a verdict in favor of Kowalis and against Eggum on the counterclaims for both defamation and false light. It awarded Kowalis compensatory damages of $1 on the count for defamation and $1 on the count for false light invasion of privacy, and it awarded punitive damages of $1, for a total damages award of $3.

¶ 31    As indicated above, the trial court thereafter ruled that the jury's verdict in favor of Eggum on the fraud claim was legally inconsistent with its verdict in favor of Kowalis on the counterclaims for defamation and false light. In its written ruling, the trial court stated that, although it was possible that the jury had found that both parties made false statements, that argument would not resolve the inconsistency: "If the jury concluded that Eggum proved Kowalis' false statement and the jury concluded that Eggum's false statement about Kowalis were proven defamatory, it is not possible to reconcile the verdicts." The trial court also found it "untenable" that the jury could have distinguished between criminal fraud and civil fraud, as it had not been given any instructions as to the legal standards applicable to a claim involving criminal fraud. Accordingly, the trial court granted the motion to set aside the verdict and ordered a new trial.

¶ 32    By that same order, the trial court denied a petition by Eggum seeking attorney fees, and it conditionally ruled (pending the new trial) that Kowalis was entitled to a setoff in the amount of the settlement that Eggum had previously reached with Tsonis. Kowalis's posttrial motion had

also raised an argument that, in the alternative to granting a new trial, the verdicts in favor of Eggum should be set aside and judgment notwithstanding the verdict (JNOV) entered in favor of Kowalis on the basis that Eggum did not prove all of the elements of his claims. Kowalis also filed a supplement to his posttrial motion raising additional arguments for JNOV on Eggum's breach of fiduciary duty claim. Having granted Kowalis's request for a new trial, the trial court expressly declined to consider this alternative argument for JNOV raised by Kowalis.

¶ 33    This court thereafter allowed Eggum's petition for leave to appeal the order granting a new trial. Eggum also appeals the trial court's rulings on the issues of attorney fees and setoff that were contained in that order.

¶ 34                                II. ANALYSIS

¶ 35                    *A. Kowalis's Motion to Dismiss Appeal*

¶ 36    Preliminarily, Kowalis urges this court to dismiss this appeal. He argues that the appeal is unripe for decision or that we improvidently granted the petition for leave to appeal because the trial court did not fully rule on his arguments for JNOV in his posttrial motion. In the order under review, the trial court specifically wrote, "Having concluded that a new trial is required the Court will not further consider Kowalis' motion for judgment notwithstanding the verdict."

¶ 37    This argument by Kowalis has an extensive procedural history. After the trial court entered the order at issue, Eggum's petition for leave to appeal it was timely filed within 30 days. See Ill. S. Ct. R. 306(c)(1) (eff. 1, 2020). Although Kowalis had apparently raised this issue in the trial court by the time he filed his answer to the petition for leave to appeal, that answer made no argument that we should decline or defer acceptance of the appeal because it was unripe or otherwise because the trial court had not fully ruled on all requested relief. This court granted the petition for leave to appeal 10 days after the answer was filed, which had the effect of automatically

staying all proceedings in the trial court. See Ill. S. Ct. R. 306(c)(6) (eff. Oct. 1, 2020).

¶ 38        Six days after we granted the petition for leave to appeal, Kowalis filed a motion in this court seeking to partially lift the stay of proceedings in the trial court to allow it to consider his pending motion to renew that aspect of his posttrial motion for JNOV on Eggum's breach of fiduciary duty claim only. Eggum filed an objection to the motion to lift the stay, arguing that a stay may not be lifted for the purpose of allowing the trial court to modify an order that is the subject of the appeal. See Ill. S. Ct. R. 306, Committee Comment (May 29, 2014). While this motion was pending, the trial court, apparently unaware that the stay had taken effect, entered an order purporting to grant JNOV in favor of Kowalis on Eggum's breach of fiduciary duty claim. This court, which was by then fully aware of the trial court's purported ruling, denied the motion to lift the stay.

¶ 39        Kowalis thereafter filed a motion in this court to reconsider its order denying his motion to lift the stay. Kowalis argued that there was "a fundamental and insurmountable problem with any review" of the order granting a new trial because the trial court had expressed "its intention to supersede and modify" the order of which we had allowed review. Eggum filed a response in opposition, and this court thereafter denied Kowalis's motion to reconsider.

¶ 40        Kowalis then filed a motion in the Illinois Supreme Court seeking a supervisory order to compel this court either to dismiss the present appeal as improvidently granted or alternatively to lift the stay so that the trial court could formally decide Kowalis's pending motion for JNOV. The Illinois Supreme Court thereafter denied the motion for supervisory order.

¶ 41        Kowalis now seeks to raise this issue again in his appellee's brief, urging us to dismiss this appeal on the basis that the order granting a new trial is "clearly incomplete as it failed to address all of the issues raised" in Kowalis's posttrial motion. Kowalis argues that "no matter what [the appellate court] decides, this case will go back to the trial court and will ultimately find its way

back" to this court because the trial court has "indicated that it intends to rule in Kowalis' favor" on the motion for JNOV.

¶ 42        Given the above procedural history, we decline now to dismiss this appeal. In our view, this is a problem of Kowalis's own making due to the fact that the primary relief he requested in his posttrial motion to set aside the verdicts was a new trial, which he received. Whatever the reason, it is clear from his posttrial motion and reply brief that JNOV was requested only as alternative relief. While it is arguable that the trial court should have proceeded to make a conditional ruling on the merits of this issue (see 735 ILCS 5/2-1202(f) (West 2024)), under these circumstances, its express decision not to consider the alternative request for JNOV does not cause us to view this Rule 306(a)(1) appeal as unripe or to believe that we allowed it improvidently. This is not an instance in which an appellant is improperly seeking to appeal in a piecemeal fashion. Instead, we have before us a fully briefed interlocutory appeal concerning an order as to which we have appellate jurisdiction to review. Judicial economy demands that we proceed to decide the issue presented, notwithstanding the possibility that the case might come back to us later as an appeal after final judgment.

¶ 43                                *B. Inconsistent Verdicts*

¶ 44        On the merits, Eggum argues that the trial court erred by ordering a new trial on the basis of its conclusion that the jury's verdict in favor of Eggum on his fraud claim was legally inconsistent with its verdict in favor of Kowalis on his counterclaims for defamation *per se* and false light invasion of privacy. Eggum argues that these verdicts are not legally inconsistent because the trial evidence was sufficient to allow reconcilable findings both that Kowalis was liable for fraud and that Eggum was liable for defamation and false light. Eggum also argues that Kowalis introduced the alleged error that he now claims exists and failed to object to the jury instruction that permitted

this outcome.

¶ 45    The general rule is that if that a single jury, considering the same set of facts and circumstances, reaches two different factual conclusions as expressed by their verdicts, such verdicts will not support a valid judgment unless they are reconcilable under an applicable rule of law. *Redmond v. Socha*, 216 Ill. 2d 622, 642 (2005). Thus, where in the same action verdicts are returned that are legally inconsistent with each other, those verdicts should be set aside and a new trial ordered. *Wottowa Insurance Agency, Inc. v. Bock*, 104 Ill. 2d 311, 316 (1984). Whether two verdicts are legally inconsistent is a question of law. *Redmond*, 216 Ill. 2d at 642. Accordingly, a trial court's order granting a new trial based upon a claim of legally inconsistent verdicts is a matter that we review *de novo*. *Id.* In considering whether verdicts are legally inconsistent, a court will exercise all reasonable presumptions in favor of the verdicts, and they will not be found legally inconsistent unless they are "absolutely irreconcilable." *Id.* at 643. Further, verdicts will not be considered irreconcilably inconsistent if they are supported by any reasonable hypothesis. *Id.* at 644. We are also mindful that, although the complaint and counterclaim were consolidated for trial, they remain distinct causes of action. *Id.* Only when a judgment rests on some particular finding for its validity and support will inconsistencies between two findings' treatment of the same essential matter necessitate a new trial. *Id.*

¶ 46    We also set forth the various factual elements that the parties were required to prove to sustain their respective causes of action. Eggum's claim was for fraudulent inducement, which is a form of common-law fraud. See *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17 (1995). In an action for common-law fraud, a plaintiff must establish that (1) the defendant made a false statement of a material fact, (2) the defendant knew or believed the statement to be false, (3) the defendant intended that the plaintiff rely on the statement, (4) the plaintiff acted in justifiable reliance on the

statement, and (5) the plaintiff suffered damages resulting from his reliance. *Weber v. DeKalb Corp.*, 265 Ill. App. 3d 512, 516 (1994). The jury here was instructed in accordance with these elements. It was also instructed that the first two elements must be proved by clear and convincing evidence and that the last three must be proved more probably true than not true.

¶ 47    Kowalis's counterclaims were for defamation *per se* and false light invasion of privacy. We note that these are overlapping but distinct causes of action. Our supreme court has observed that all defamation cases can be analyzed as false-light cases, but not all false-light cases are for defamation. See *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 421 (1989). A defamation claim requires proof that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). A plaintiff does not need to prove actual damages to his reputation in cases where the defendant's published statement falls within one of the categories of defamation *per se*, which are those considered to be so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed. See *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). Illinois recognizes five categories of statements considered defamatory *per se*, of which three are relevant here: (1) words imputing a person has committed a crime, (2) words imputing a person is unable to perform or lacks integrity in performing his or her employment duties, and (3) words that impute a person lacks ability or otherwise prejudices that person in his or her profession. *Green*, 234 Ill. 2d at 491-92. In accordance with the above, the jury in this case was instructed that to prove defamation *per se*, Kowalis had the burden of proving: (1) that Eggum made a statement imputing Kowalis has committed a crime, or imputing that Kowalis is unable to perform or lacks integrity in performing his employment duties, or imputing that Kowalis lacks ability or otherwise prejudices

Kowalis in his profession, (2) that the statement was false, and (3) that there was an unprivileged publication of that false statement to a third party by Eggum.

¶ 48    A claim for false light invasion of privacy requires proof that (1) the plaintiff was placed in a false light before the public as a result of the defendant's actions, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 17-18 (1992) (citing *Lovgren*, 126 Ill. 2d at 419-23). The jury here was instructed in accordance with these elements on Kowalis's false-light counterclaim also.

¶ 49    In arguing that the jury's verdicts on the claims at issue were not legally inconsistent, Eggum first assets that there is no overlap between the above elements required to be proven to establish the parties' respective claims or within the jury instructions as to those claims. Accordingly, he argues, it can be reasonably hypothesized that the jury found that some statements made by Kowalis to induce Eggum to invest in Kerouacs were false (thus supporting his fraud claim) while simultaneously finding that some of Eggum's statements about Kowalis were also false (thus supporting Kowalis's defamation and false light claims). Eggum highlights the fact that Kowalis's counterclaims were premised on numerous allegedly false statements by Eggum (*e.g.*, his GoFundMe page, his Facebook post, the CBS interview, and e-mails to Kowalis's employers and related parties), any part of which could have been found false by the jury but not irreconcilable with a finding that Kowalis committed fraud. He offers as an example that the jury could have found that Kowalis falsely represented that he and Tsonis owned 100% of Kerouacs and that Eggum relied on this statement in investing his money. Simultaneously, it could have found that Eggum made a false statement imputing that Kowalis lacked integrity in performing his

employment duties when Eggum's agent sent an e-mail to Lexus of Merrillville stating that Kowalis was "defrauding potential investors under the guise of being a director in the Toyota and Lexus family and maybe buying some legitimacy with the title."

¶ 50     We reject Eggum's arguments and agree with the trial court that the jury's verdicts in this case were legally inconsistent. We find from our review of the evidence that, at their core, all three claims at issue turn upon whether Eggum was defrauded out of his investment into Kerouacs by Kowalis's statements. The jury could either find by its verdict that Kowalis did this, or it could find that Eggum's public statements accusing Kowalis of doing this were false. It cannot do both. In other words, it could either find that Kowalis's conduct amounted to fraud inducing Eggum to transfer his investment into Kerouacs, or it could find that Eggum's public statements—all of which were essentially that Kowalis had defrauded him into investing his money into Kerouacs— were false. But we find it inconsistent for the jury to reach verdicts that depend on both of these opposing facts being established as proven at least more probably true than not true.

¶ 51     We acknowledge Eggum's point that Kowalis's counterclaims involved multiple publications that were potentially broad enough to encompass a variety of statements containing untruths. As a result, this court has endeavored to carefully review the trial transcript to understand whether any of the counterclaims were presented to the jury in such a way that the gravamen of the alleged false statement by Eggum involved something other than a statement that Kowalis had defrauded him out of his investment money. In our view, that did not occur. All of the alleged defamatory statements or statements placing Kowalis in a false light involved some statement by or on behalf of Eggum asserting that Kowalis had defrauded him out of his investment into Kerouacs. This is illustrated in the example Eggum provides that we set forth above. While that statement references Kowalis's employment, its defamatory gist is not an imputation that he lacks

integrity in performing his employment duties as director of marketing for a car dealership. Its defamatory gist is that he was "defrauding potential investors," which in the context of the e-mail referred to Eggum and his investment into Kerouacs. Accordingly, we do not find this to be a basis upon which the verdicts at issue can be reconciled.

¶ 52    Eggum also argues that the verdicts can be reconciled by hypothesizing that the jury could have found the false statement by Eggum to be that Kowalis committed criminal fraud, not civil fraud. Eggum points out that these involve different burdens of proof, and the jury could have found the elements of civil fraud to have been proved by clear and convincing evidence while also concluding that it was false when Eggum stated publicly that Kowalis had committed criminal fraud for which he was being investigated by the FBI. Eggum argues that these are reasonable hypotheses that must support the legal consistency of the jury's verdicts.

¶ 53    We reject this argument also as a basis by which the verdicts can be reconciled. We find that it requires too much speculation to hypothesize that the jury applied a criminal burden of proof to an aspect of the defamation and false light claims when it had not been given any instruction to do so by the trial court. We thus agree with the trial court that it is "untenable" to assume the jury may have applied criminal legal standards as to which had not been instructed. But even if the jury had in mind a layperson's understanding of criminal fraud, it was instructed only that Eggum's false statement had to be one "imputing" that Kowalis committed a crime. It is not reasonable to hypothesize that the jury understood this to mean that Eggum's statements were false because it was not shown that Kowalis was actually guilty of a crime involving fraud. Accepting this as a hypothesis for reconciling the verdicts here would be tantamount to presuming that the jury misunderstood or failed to follow the trial court's instructions, which we will not do. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 20.

¶ 54 Finally, Eggum argues that we should find that Kowalis waived any argument that the verdicts in this case were legally inconsistent because Kowalis proffered a jury instruction that led to this outcome. Eggum relatedly argues that Kowalis invited the present error by proposing this jury instruction and never raising any objection to it. Under this argument, the alleged legal inconsistency in the verdicts was invited by paragraph 6 of the following jury instruction that Kowalis proffered in this case:

> "[1] In this suit, there is not only the complaint of Plaintiff Michael Eggum but also a counterclaim by Defendant Ryan Kowalis.
>
> [2] Because there is a counterclaim in this case you shall reach one of four results.
>
> [3] First, you may find for Plaintiff Michael Eggum on his complaint and against Defendant Ryan Kowalis on his counterclaim.
>
> [4] Second, you may find for Defendant Ryan Kowalis on his counterclaim and against Plaintiff Michael Eggum on his complaint.
>
> [5] Third, you may find against both, Plaintiff Michael Eggum on his complaint and Defendant Ryan Kowalis on his counterclaim.
>
> [6] Fourth, you may find for both, Plaintiff Michael Eggum on his complaint and Defendant Ryan Kowalis on his counterclaim." See Illinois Pattern Jury Instructions, Civil, No. B21.04 (2011).

¶ 55 We find no merit to Eggum's arguments that paragraph 6 of the above instruction invited or permitted the jury to reach legally inconsistent verdicts in this case. The above instruction, which is an Illinois pattern jury instruction that is applicable to this case because both a complaint and a counterclaim were before the jury, speaks to the four broad results that the jury could reach on the plaintiff's "complaint" and the defendant's "counterclaim." Beyond this, it simply does not purport

further to instruct the jury as to the results it can permissibly reach on the various counts or causes of action raised in those pleadings for its verdicts to be legally consistent. We see no reason why parties could not seek a modified version of this instruction that is more explicit in cases that present a risk of inconsistent verdicts due to the specific claims raised. But Kowalis's mere proffering of this applicable pattern jury instruction did not invite error, nor does it cause us to conclude that he waived the argument that the verdicts reached were legally inconsistent.

¶ 56 In conclusion, we affirm the order granting a new trial on the grounds that the jury verdicts were legally inconsistent. Because we believe that the issues of attorney fees and the right to setoff could be affected by the retrial, we decline to address Eggum's arguments on these issues in this interlocutory appeal.

¶ 57                                    III. CONCLUSION

¶ 58 For the foregoing reasons, the trial court's order setting aside the verdicts and ordering a new trial is affirmed.

¶ 59 Affirmed.